Helen K. BUSH, Plaintiff,

v.

Anthony CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.

Civ. No. 64-2.

United States District Court
D. Oregon.
April 5, 1965.

Robert H. Grant, Kelly & Grant, Medford, Or., for plaintiff.

Charles H. Habernigg, Asst. U. S. Atty., Portland, Or., for defendant.

EAST, District Judge.

Plaintiff brings this proceeding under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review the denial of her application for establishment of a period of disability and for disability insurance benefits under §§ 216(i) and 223(a), respectively, of the Act, 42 U.S.C. §§ 416 (i) and 423(a).

This action follows complete administrative consideration of plaintiff's claim, including a hearing before an examiner of the Bureau of Hearings and Appeals, Social Security Administration, and a refusal by the Bureau's Appeals Council to review the examiner's denial of relief. That refusal to review made the examiner's decision the final decision of the Secretary and subject to this proceeding under 42 U.S.C. § 405(g), which provides, in relevant part, that

> "Any individual, after any final decision of the Secretary made after a hearing to which he was a party, * * * may obtain a review of such decision by a civil action * * * brought in the district court of the United States for the judicial district in which the plaintiff resides or has his principal place of business, * * *."

The facts upon which the examiner acted were drawn from the hearing and from detailed written reports submitted by several physicians. Plaintiff is 55 years old, divorced, with an eighth-grade education and no specialized or technical

training. Her work experience reflects her limited occupational skills. Before her marriage, plaintiff worked 17 years in a creamery, cutting, wrapping, crating and loading butter. This work necessitated standing about ⅔ of the working day and sitting the remainder. After her marriage, plaintiff worked briefly as a maid in a California motel-hotel and then helped her husband operate their small gas station and store. She pumped gas, put oil in cars and washed windshields. She also milked cows and fed farm animals on land she and her husband occupied. In 1953, plaintiff and her husband purchased a larger store and gas station. Her work broadened to include assistance in virtually every facet of the operation. From 1959 to 1961 plaintiff's husband was increasingly absent from the store-station, and the entire management had gradually devolved upon her by the time she and her husband were divorced in 1961. She continued to operate the store-station for a few months after the divorce, but then sold the operation, apparently finding it more than she could handle. Plaintiff has not been gainfully employed since that sale, and has been living on a $103 monthly income—$73 from welfare and $30 from repayment of a loan.

Plaintiff testified at her hearing that she was not ill when she sold the business but that she had since experienced a rapidly declining state of health. When she filed her initial application for benefits she was suffering from frequent dizzy spells; numbness in plaintiff's fingers had stopped her crocheting seven months before the hearing; she was troubled by water retention problems and by a dull, arthritic pain in the spine, hips, shoulders and knees. To combat the pain, plaintiff took a pain pill each morning, supplemented by 15 to 20 aspirin during the day. She testified prolonged sitting (beyond a half-hour) and bending over to lift objects aggravated the pain. She indicated prolonged standing brought edema in her feet and aching in legs and hips. At the time of her hearing, plaintiff was still doing her own cooking and housework and drove, rather than walked, when she needed to go somewhere.

Plaintiff testified that before selling her store she made limited inquiry about creamery employment and was told jobs such as those she had held before still existed but were not available. She also tried to find work caring for sick people. Plaintiff asserted she failed to look more diligently for work because she felt physically unable to render proper service. More specifically, she contended stiffness in her fingers would not permit wrapping butter and that she could not tolerate the lifting entailed in loading butter.

After her initial application for benefits, plaintiff was examined by several different physicians. In October, 1961, Dr. Brian Stringer noted back and shoulder pains as subjective complaints. An x-ray analysis received from a radiologist indicated: (1) moderately extensive hypertrophic alterations of the lower thoracic and lumbar spine; (2) hypertrophic alterations of the hips; (3) a curvaline ossific density adjacent to the superior aspect of the greater trochanter of the left femur; and (4) a bilateral renal function with morphilogically normal appearing renal-collecting systems. Dr. Stringer diagnosed: (1) chronic pyelonephritis; (2) marked hypertrophic osteoarthritis of the spine; and (3) chronic anxiety state.

In February, 1962, Dr. Ray L. Casterline examined the plaintiff at government expense. He characterized her as a "hesitant historian with a multiplicity of minor complaints." He found plaintiff able to place her hands behind her head and her thumbs to the inferior tip of the scapula. The physician noted a 30–50 per cent reduction in internal-external rotation of the left hip. Straight leg-raising and flexion were reported normal. Plaintiff was able to bend at the waist and reach her fingertips to a point six inches above the floor. Lateral flexion was described as fair to good and without pain or muscle spasm. Dr. Casterline also reported rather extensive osteoarthritic changes throughout the lower dorsal and lumbar spine. He summarized by noting

"obvious evidence of a bone and joint problem" and "some chronic bronchitis" and a background "historically supporting urinary tract abnormality." However, he noted "little evidence of significant impairment in activity of her bones and joints, very little evidence of renal insufficiency." Dr. Casterline observed plaintiff's principal difficulty "may very well be her reaction to the stress of her husband's leaving her * * *" More specifically, he diagnosed: (1) chronic, mild bronchitis, probably due to smoking; (2) osteoarthritis, showing no marked limitation of motion except at the left hip; (3) pyelonephritis, from history, showing chemical findings compatible with early renal insufficiency with no clinical signs or symptoms; (4) hypesthesia of the right trunk, non-anatomical distribution; (5) anxiety state apparently due to emotional stress following her husband's leaving her. Dr. Casterline concluded that plaintiff "should be able to work about a grocery store, doing work ordinarily expected of a woman in a grocery store." He re-emphasized the principal problem "may well currently be the emotional reaction to her husband's departure and intensification of her somatic symptomatology, the result of her emotional state."

In April, 1962, plaintiff was examined again by Dr. Stringer, who once more diagnosed chronic pyelonephritis and osteoarthritis and noted that plaintiff's symptomatology "had worsened at time of this examination."

In July, 1962, plaintiff was examined by Dr. N. J. Wilson, such examination disclosing, among other things, "very slight limitation in flexion and hyperextension of the cervical spine" and "very little limitation in rotational movements of her neck." Dr. Wilson also noted "generalized evidence of hypertrophic arthritis in her entire spine, most marked, however, in the mid-upper lumbar and dorsal areas" and evidence of "degenerative arthritis in both hips." He concluded plaintiff "probably is limited, even with use of her back support, to quite a degree by these symptoms." He also concluded "there is undoubtedly a large anxiety and emotional element involved in her symptoms." He asserted that "she is far from totally disabled" and that there were "undoubtedly some forms of light work that she could still tolerate." In a later report, Dr. Wilson specified the acceptable forms of "light work" by indicating plaintiff "could be expected, if capable, to carry out secretarial or receptionist work and most bench-type jobs."

In August, 1962, Dr. Harry Danielson, a psychiatrist, examined plaintiff. He found her to be a "dependent person who has a low frustration tolerance and poor adaptive ability at this time, and she shows considerable evidence of arrest of emotional growth." Dr. Danielson's specific psychiatric diagnosis was "personality trait disturbance, passive-aggressive personality, passive dependent type." According to the diagnosis, plaintiff "seems to be seeking support, comfort and reassurance with poor tolerance of frustration stress." He concluded that "personality factors do interfere with her reaction to pain and would certainly interfere with her ability to perform gainful work." He indicated it would be "most difficult for her to work with others effectively and predictably in a vocational setting, especially because she is rigid, distrustful, and somewhat antagonistic to any attempt to control her" and that plaintiff "would not adjust to a retraining program." Dr. Danielson also asserted psychiatric treatment "would have little affect (sic) in influencing her pain response" and concluded that plaintiff "is disabled for full-time employment."

In denying the relief sought by plaintiff, the hearing examiner observed that the "findings of the physicians accurately describe the claimant's limitation as well as her residual capacities at the time when her application was effective." He contended medical evidence had not established that she "lacks the ability to perform 'significant functions' such as moving about, handling objects, hearing, speaking, reasoning, or understanding." He asserted that "subjective complaints of multoskeletal discomfort are not fully supported by objective clinical findings of

severe organic pathology" and that her "alleged neurological deficits do not follow anatomical patterns." Moreover, the examiner noted that "her appearance, demeanor and physical movements during and after the hearing belie her complaints of a serious loss of physical functions." He viewed the evidence as indicating that "her chief impairment, during the effective period of her application, involved her nervous system" and, more specifically, that she is "defensive about the loss of her husband and has strong dependent needs." However, "instead of resolving her problems realistically, she has resorted to a 'multiplicity of somatic complaints.'"

The examiner thus decided that no emotional or intellectual impairments sufficient to justify relief existed, "Dr. Danielson notwithstanding." The examiner noted that, under applicable regulations, findings of an expert witness are not always binding, and the "weight to be given to his conclusions depends upon the extent to which they are supported by clinical evidence and are consistent with the other evidence." Here the examiner concluded that Dr. Danielson's clinical findings failed to support a finding of disability "unless he is using a standard of reference other than those found in the social security regulations" and that "the conclusions of other medical examiners, including the claimant's own physicians, are inconsistent with those of Dr. Danielson."

The role accorded this Court in reviewing the Secretary's decision is defined by § 205(g) of the Social Security Act, 42 U.S.C. § 405(g). That section provides in relevant part:

 "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * *."

No one contends plaintiff had failed to meet the special-earnings requirement for insured status when she filed her application on November 24, 1961. Likewise, the parties agree plaintiff must establish she was under a disability that began no later than February 24, 1962, to secure a disability "freeze" and no later than February 1, 1962, to secure disability insurance benefits. 42 U.S.C. §§ 416(i) (2), 423(c) (3). For purposes relevant here, §§ 216 (i) and 223 of the Act, 42 U.S.C. §§ 416 (i) and 423, define "disability" as

 "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued or indefinite duration."

Thus, the sole issue before this Court is whether the Secretary's decision that plaintiff was not disabled at the relevant times is supported by substantial evidence.

 Substantial evidence, as this Court has noted before, is "more than a scintilla, it is such evidence as a reasonable mind would accept as adequate in support of a conclusion." Johnson v. Flemming, 188 F.Supp. 447, 449 (D.Or. 1960). And the substantial-evidence rule, while not permitting a *de novo* consideration of plaintiff's case in this court, "does not constitute a basis for abdication of the Court's normal power and function of judicial review." Hughes v. Flemming, 195 F.Supp. 724, 726 (D.Or.1961).

 I have concluded that the record supports the examiner's decision that plaintiff is not disabled, within the meaning of the Act, by a physical impairment. Several physicians, as noted, while recording a definite limitation in plaintiff's capabilities, also concluded she was capable of various forms of light work. A somewhat more difficult problem is presented by the evidence concerning a mental impairment. Virtually all of the examining physicians noted some emotional problem. One or two diagnosed a "chronic anxiety state." And the diagnosis of Dr. Danielson, a psychiatrist, has already been quoted at length. Thus, the medical evidence is virtually unanimous in detecting some emotional difficulty, apparently

stemming from the disintegration of plaintiff's marriage. However, the examining physicians were certainly not in accord in assessing the seriousness of plaintiff's reactions to her marital difficulties.

Perhaps no area of social security disability law is less clearly defined than that of disabling mental impairments. Generalities are particularly hazardous, of course, and the facts of each case have a crucial importance. Not all generalities, however, are impossible. Certainly, as another judge of this court has declared, a plaintiff need not "prove himself so mentally impaired that he must be institutionalized or that he is unable to comprehend the nature of the world around him." Turner v. Celebrezze, 231 F.Supp. 869, 871 (D.Or.1964). On the other hand, not every resentment or negative reaction or difficulty of adjustment to some adverse circumstance of life can, in and of itself, be considered disabling. There must be an inability to engage in substantial gainful activity resulting from a medically determinable mental impairment that can be expected to result in death or to be of long-continued or indefinite duration. Evaluating the impairment and estimating its effect upon the ability to work are especially difficult responsibilities in the area of mental (as distinguished from physical) impairments.

In some cases, a finding of disability has seemed fairly clearly indicated. In Turner v. Celebrezze, supra, for example, the psychiatric diagnosis included " '[c]hronic brain syndrome, associated with brain trauma, with severe encephalology, and vertigo, and some regression.' * * * " The diagnosis also noted " 'depressive reaction, and so-called post traumatic cerebral syndrome' " and a " 'passive aggressive personality pattern' " over which " 'there has been superimposed a psychophysiologic nervous system reaction.' " Id. at 870, 871. In Ditlow v. Celebrezze, 214 F.Supp. 532 (D.Md.1963), the data indicated " 'a man who entertained both grandiose as well as persecutory ideas' " and subject to " 'sporadic outbursts of aggressive behavior, verbal chiefly, mixed with some personal idea-

tion.' " The plaintiff was also described as " 'socially isolated, withdrawn' " in an " 'attempt to control paranoid ideas by not subjecting himself to personal relations.' " The diagnosis was " '[s]chizophrenic reaction, chronic undifferentiated type (borderline schizophrenic).' " Id. at 534. However, in Goodwin v. Celebrezze, 217 F.Supp. 941 (D.Maine 1963), two examining psychiatrists believed plaintiff's difficulties stemmed from general, or personality, inadequacy and that plaintiff "was using his symptoms to avoid the stresses of reality with which he was unable to cope." Id. at 942. The examiner's denial of disability benefits was affirmed.

I have concluded that substantial evidence supports the examiner's denial of disability benefits in this case in view of the difference of opinion among the examining physicians regarding the severity of plaintiff's emotional difficulties. Dr. Danielson, on the one hand, has an "impression" of disability. Other examining physicians, albeit not psychiatrists, made a contrary appraisal. One can reasonably conclude from these differing opinions that plaintiff has faced certain unfortunate adult experiences to which she has had some difficulty adjusting, but which do not, in fact, prevent her from engaging in substantial gainful activity.

Quite apart from the question of physical and mental capacity, however, is the problem of available work. The law in the Ninth Circuit is clear—establishment of an ability to engage in substantial gainful employment requires determining " 'what can applicant do, and what employment opportunities are there for a [woman] who can do only what applicant can do?' " Graham v. Ribicoff, 295 F.2d 391, 394 (9th Cir. 1961), quoting Kerner v. Flemming, 283 F.2d 916, 921 (2d Cir. 1960). The record in the instant case is almost devoid of evidence concerning availability of the narrow range of jobs the medical evidence indicates plaintiff can fill. In her testimony before the examiner, plaintiff indicated she briefly investigated the possibility of returning to her creamery work and that such work, though still existing, was not available.

However, the record clearly establishes plaintiff is not able to tolerate the lifting associated with her former employment, thus leaving virtually nothing in the record to indicate feasible work opportunities. This omission must be dealt with by the examiner in accordance with Graham v. Ribicoff, supra.

Accordingly, the motions of both parties for summary judgment should be denied and the cause remanded to the hearing examiner to secure evidence and make findings regarding the availability of work opportunities within the range of work indicated for plaintiff by the medical findings.

Counsel for plaintiff should submit appropriate order.